**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

EAD GROUP LLC,

        *Plaintiff*,

    v.

BULENT TOROS, UBS GROUP AG
individually and as successor in interest to
CREDIT SUISSE GROUP AG, EGEMEN
BAŞAR, CREDIT SUISSE SECURITIES
(USA) LLC, İŞ YATIRIM MENKUL
DEĞERLER A.Ş, and YASEMIN TOROS,

        *Defendants*.

Civil Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff EAD Group LLC ("Plaintiff" or "EAD"), by its undersigned attorneys, for its

Complaint against Bulent Toros ("Toros"), Egemen Başar ("Başar"), UBS Group AG as successor

in interest to Credit Suisse Group ("Credit Suisse"), Credit Suisse Securities LLC ("Credit Suisse

Securities"), İş Yatirim Menkul Değerler A.S. ("İş Yatirim"), and Yasemin Toros.

**INTRODUCTION**

1.      This case arises from a calculated, multi-year orchestrated racketeering scheme in

which Defendants collectively stole 3.56 million shares of Aeva Technologies, Inc.

("Company")—worth tens of millions of dollars—from its President, Chief Technical Officer, and

Chairman, Mina Rezk.  The Defendants operated as an ongoing criminal organization that

repeatedly used interstate wires, bank fraud, and securities fraud to misappropriate collateral and

launder the proceeds.  The centerpiece was a loan agreement Toros signed that expressly prohibited

him from hedging, pledging, or selling a single share of the collateral.  On paper, Toros agreed.  In

reality, before the ink was dry, he and his co-conspirators were plotting to dump every share the moment they arrived in his control while concealing the theft behind a façade of legitimate banking activity.

2.      The Defendants' scheme rested on three coordinated pillars of deception and fraud:

a.    **Institutional cover from Credit Suisse** — Toros exploited Credit Suisse's decision to install his long-time associate Egemen Başar as his personal relationship manager.  Başar had previously worked with Toros for five years, had his MBA personally funded by Toros, and, upon information and belief, acted as Toros' "inside man" within the bank.  This placement gave Toros unfettered, real-time control over an account he did not own, with Credit Suisse's systems, personnel, and reputation shielding his unauthorized actions from detection.

b.    **Fabricated statements and fraudulent communications** — Toros and Credit Suisse fabricated multiple statements over a 2.5-year period, each engineered to conceal the disappearance of millions of shares.  Plaintiff has since learned that one of these fabricated statement was issued for a date after the account had already been closed for over 1.5 years.  At the same time, Toros issued fraudulent communications—including demand letters riddled with lies (such as claiming WMS might "fire sale" collateral it had already liquidated) and voting confirmations falsely asserting that shares had been voted.  By transmitting these doctored statements directly to Rezk, they maintained the illusion that his collateral was safely intact while secretly liquidating it.

c.    **Market manipulation and margin call abuse** — Toros crashed Aeva's share price through unauthorized sales, then used the very decline he caused to demand "top-ups," extracting even more collateral to steal.

3.      Toros planned the theft before Rezk ever signed anything.  In May 27, 2022 —
weeks before receiving Rezk's shares— Toros circulated internal emails showing his intent to steal
the shares.  He predicted Aeva's stock would "drop 90 percent anyway" and instructed his team to
"capture interest + principal."  During negotiations, Rezk explicitly rejected any structure that
allowed hedging or selling and demanded strict protections—and ultimately agreed to a higher
interest rate, lower loan-to-value ratio, and a multi-year interest commitment in return.  Toros
agreed on paper.  But internally, Toros never believed in the stock, never intended to honor the
restrictions, and fully planned to dump the shares the moment they arrived.

4.      Third-party data reveals that within days of receiving Rezk's 2.4 million collateral
shares ("Collateral") on July 8, 2022, Toros leveraged his Credit Suisse connections to liquidate
them.  Credit Suisse Securities' daily Aeva trading exploded from 9,729 to 49,439 shares—a 513%
increase.  At the time, Aeva's trading volume was just 62,000 shares a day, meaning Toros and
Credit Suisse's massive sell-off constituted ***80% of Aeva trading during that period***.  By
September 2022, Toros and Credit Suisse had already liquidated 1.84 million of Rezk's shares.
This massive sell-off caused Aeva's share price to drop 39%.

5.      With Credit Suisse and Mr. Başar's assistance, Toros forged documents to hide his
fraud.  On July 11, 2022, days after receiving Rezk's shares, Toros sent Rezk a Credit Suisse
account statement that said the collateral was safely held in a segregated account under EAD's
name.  The statement was fake.  Analysis reveals it was scanned from a physical copy rather than
produced electronically, with mismatching page numbers and inconsistent formatting.  Toros and
Credit Suisse would forge three more statements over 2.5 years.

6.      Toros then exploited the stock price decline he had created to swindle more shares
from Rezk.  In September 2022, Toros' employee emailed Rezk demanding he deposit more Aeva

shares as a top-up amount on his collateral due to Aeva's share price decline.  Toros failed to disclose that his own illicit sales had caused the decline.  Instead, Toros presented the top-up request as routine while actively stealing from the very account he was asking Rezk to replenish.

7.     In April 2023, Toros tripled down on his fraud.  Having driven Aeva's stock price down 71% through unauthorized selling, Toros demanded another Top-Up.  In his April 5 demand letter, he claimed that Aeva's share price put WMS at risk of having to "fire sale the collateral." That statement was false: it could only be made if WMS still held the Aeva shares as collateral, when in fact large portions had already been sold off. This false assurance exemplifies WMS's broader scheme: while dissipating the pledged shares, WMS continued to misrepresent that it still held them, invoking the specter of a "fire sale" to extract more stock. Toros omitted that he himself had been liquidating the shares for nine months and contributing to the price collapse. On the strength of these misrepresentations and omissions, Rezk was induced to provide another 700,000 shares—shares that would also vanish.

8.     Toros' brazenness knew no bounds.  In October 2022 and December 2023, Rezk exercised his right in the Lending Agreement to vote his shares and sent Toros' agents instructions on how to vote all of them.  Each time, Toros accepted his instructions and never revealed he had already stolen and sold the shares.

9.     Each Defendant actively participated in this fraud.  Credit Suisse and Credit Suisse Securities executed massive sales from an account in EAD's name without informing Rezk or verifying authorization.  Credit Suisse and Başar provided Toros with doctored statements to perpetuate the deception while processing millions in unauthorized trades.  İş Yatırım accepted 700,000 shares with explicit knowledge they were collateral subject to return conditions, then allowed them to vanish.

10.     Even as the scheme unraveled, Toros sought one final deception.  In December 2024, he proposed a "Wind-Up Agreement" to liquidate already-stolen collateral while extracting a release "from the beginning of time" for all claims "related to, arising out of, or in connection with the Share Collateral."  This was not a settlement offer but an attempt to legitimize three years of theft.

11.     The truth emerged only when Toros could no longer lie.  In May 2025, when Aeva's stock price rose to $13.15, Rezk demanded his shares back.  Toros stalled for weeks with manufactured excuses about "delays from the bank" and "DTCC issues."  On May 31, 2025, Toros fled the United States for Turkey.  Four days later, he admitted in writing "the shares have been liquidated as a result of an unmet margin obligation."  In a phone call, he confessed it was "a f**kup on my part" and that "the shares should not have been pledged."  Yet even this confession contained lies—Toros claimed the liquidation occurred in "January or February" 2025, when data proves the theft began just days after Rezk deposited his shares.

12.     The human cost extends beyond money.  These shares represented 6.47% of Aeva's voting power, giving Rezk a meaningful voice in the company he helped build.  When Aeva held its critical annual meeting on June 20, 2025, Rezk's voice was completely silenced.  Defendants' theft stripped him of his right to shape the company he runs.

13.     Now, Toros and the other Defendants are systematically attempting to prevent Rezk from recovering even the monetary value of his property.  Just two days after filing an amended arbitration demand against WMS in the International Chamber of Commerce which laid bare all of Mr. Toros' fraudulent activity, Defendant Yasemin Toros, Toros' wife, filed to dissolve WMS's wholly-owned UK subsidiary, likewise named W Management Services Ltd.

14.     This is just one instance in a string of activity designed to place Toros' assets

beyond EAD's reach. Indeed, just days before, on September 5, 2025, Yasemin Toros replaced Toros as the "person with significant control" in SRT Capital SPC UK Ltd, the UK subsidiary of another respondent in the ICC arbitration. As of the date of this complaint, Yasemin Toros owns over 75% of that entity.

15.     This action seeks accountability for orchestrating and concealing massive theft. Through RICO, fraud, conversion, aiding and abetting, and gross negligence claims, EAD seeks compensatory and statutory damages, punitive damages to deter such calculated dishonesty, and injunctive relief preventing further dissipation of ill-gotten gains.

## THE PARTIES

16.     Plaintiff EAD Group LLC is a limited liability company organized under the laws of Delaware. EAD is the Borrower under the Lending Agreement and is beneficially owned by Mina Rezk.

17.     Upon information and belief, Defendant Toros is a citizen of the state of Florida.

18.     Defendant UBS Group AG is a corporation incorporated under the laws of the Swiss Confederation and headquartered in Zurich and Basel, Switzerland. Upon information and belief, it is the successor-in-interest to Defendant Credit Suisse Group AG.

19.     Defendant Credit Suisse Securities (USA) LLC is a limited liability company incorporated under the laws of Delaware with its principal place of business in New York, New York.

20.     Upon information and belief, Defendant Başar is a citizen of the Swiss Confederation. Upon information and belief, at all relevant times, Defendant Başar was an Assistant Vice President of Credit Suisse with authority to bind the entity. Upon information and belief, Defendant Başar was previously an employee at another Toros-run entity, EMI Financial

Group LLC, from 2015 to 2020.

21.     Defendant İş Yatırım Menkul Değerler A.Ş is an investment bank incorporated under the laws of the Republic of Türkiye and headquartered in the Republic of Türkiye.

22.     Upon information and belief, Defendant Yasemin Toros is a citizen of the state of Florida.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because the claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, arise under the laws of the United States.  To the extent this action implicates state law doctrines, this Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a) as the state law claims are part of the same case or controversy.

24.     This Court has personal jurisdiction over Toros because he is an authorized signatory of the Lending Agreement, under which he agreed to submit to New York courts' jurisdiction.  Toros purposefully directed his fraudulent activities toward New York by entering into the Lending Agreement, which is "deemed to have been made in New York," by directing Rezk's payments for the loan at issue (which served as the vehicle for his fraud) to a bank in New York, by establishing accounts with New York-based financial institutions, and upon information and belief, by conducting substantial business activities within this state through his management of the entities W Management Services and SRT Capital SPC Ltd, as described below.  Toros has sufficient minimum contacts with New York such that the exercise of personal jurisdiction is consistent with due process and does not offend traditional notions of fair play and substantial justice.  The Court also has personal jurisdiction over Toros through the conspiracy theory of jurisdiction because several Defendants participated in a conspiracy in which at least one conspirator committed overt acts in this state in furtherance of the challenged conduct.  Separately

and independently, the ends of justice require the exercise of personal jurisdiction over Toros under

18 U.S.C. § 1965(b), because, absent such jurisdiction, Plaintiff's racketeering claim could not be

tried in a single action, because no district court could exercise personal jurisdiction over all of the

Defendants

25.    This Court has personal jurisdiction over Egemen Başar consistent with New

York's Long Arm Statute.  Başar transacted business within New York by executing securities

transactions through Credit Suisse's New York operations.  He personally facilitated the

liquidation of millions of shares at issue, which were sold in New York.  Başar purposefully

directed these activities at New York, using New York financial markets to sell Rezk's shares.  He

communicated with Toros about these New York-based accounts and transactions. The Court also

has personal jurisdiction over Başar through the conspiracy theory of jurisdiction because several

Defendants participated in a conspiracy in which at least one conspirator committed overt acts in

this state in furtherance of the challenged conduct.  Separately and independently, the ends of

justice require the exercise of personal jurisdiction over Başar under 18 U.S.C. § 1965(b), because,

absent such jurisdiction, Plaintiff's racketeering claim could not be tried in a single action, because

no district court could exercise personal jurisdiction over all of the Defendants.

26.    This Court has personal jurisdiction over Credit Suisse Group AG and Credit Suisse

Securities (USA) LLC consistent with the principles of due process and the New York Long Arm

Statute.  Credit Suisse Group AG maintains substantial business operations in New York, including

offices and personnel in New York City, and regularly conducts business within this state.  Credit

Suisse Securities (USA) LLC is organized under Delaware law but maintains its principal place of

business in New York, New York.  Both entities purposefully availed themselves of the privilege

of conducting business within New York, have established sufficient minimum contacts with this

state such that they should reasonably anticipate being called into court here, and purposefully directed activities at New York residents by maintaining custody accounts and executing transactions for New York-based clients. The Court also has personal jurisdiction over Credit Suisse Group AG and Credit Suisse Securities (USA) LLC through the conspiracy theory of jurisdiction because several Defendants participated in a conspiracy in which at least one conspirator committed overt acts in this state in furtherance of the challenged conduct.

27.     This Court has personal jurisdiction over İş Yatırım pursuant to the New York Long Arm Statute because İş Yatırım transacted business within New York by accepting and managing securities collateral for a New York-based transaction, maintaining custody of assets belonging to a New York resident, and participating in a fraudulent scheme that caused injury within New York. İş Yatırım purposefully directed its activities toward New York and should reasonably anticipate being called into court in this state for conduct related to its New York business activities. The Court also has personal jurisdiction over İş Yatırım through the conspiracy theory of jurisdiction because several Defendants participated in a conspiracy in which at least one conspirator committed overt acts in this state in furtherance of the challenged conduct.

28.     This Court has personal jurisdiction over Yasemin Toros through the conspiracy theory of jurisdiction because several Defendants participated in a conspiracy in which at least one conspirator committed overt acts in this state in furtherance of the challenged conduct. Separately and independently, the ends of justice require the exercise of personal jurisdiction over Yasemin Toros under 18 U.S.C. § 1965(b), because, absent such jurisdiction, Plaintiff's racketeering claim could not be tried in a single action, because no district court could exercise personal jurisdiction over all of the Defendants.

29.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial

portion of the events giving rise to Plaintiffs' claims occurred, or will occur, in this District and because certain Defendants reside in or conduct business in this District.

30.     Venue in this Court is proper under Section 1965(b) of RICO because (1) the court possesses personal jurisdiction over at least one member of the enterprise based on a traditional minimum contacts analysis with the forum state (Bulent Toros, Egemen Başar, Credit Suisse, Yasemin Toros), (2) there is no other district in which a court would have personal jurisdiction over all of the alleged co-conspirators, and (3) the facts alleged herein show a single RICO conspiracy exists.

## **FACTUAL ALLEGATIONS**

### **A. Toros Signs the Lending Agreement While Concealing His Intent to Immediately Liquidate and/or Hedge the Collateral**

31.     On June 16, 2022, EAD (as Borrower), W Management Services, Ltd. ("WMS", as Lender), and SRT Capital SPC Ltd. ("SRT", as Agent) executed the Lending Agreement.  Ex. A at 20.[1]  Toros principally manages both WMS and SRT.  The Lending Agreement provided for a "[s]ecured margin loan (the 'Loan') against the ordinary equity shares … of Aeva Technologies Inc." *Id.*  The Lending Agreement required EAD to pledge Aeva shares "sufficient to support the aggregate principal amount of the Loan."  Ex. A § 1(b); *id.* at 20 (defining the Aeva shares as "Share Collateral").

32.     During negotiations, the parties extensively discussed WMS's right to hedge or sell the Collateral.  WMS initially sought a loan-to-collateral value ratio of 30–50%, while retaining broad hedging rights over the pledged Aeva shares and the right to sell them outright under a "Hard Trigger" clause tied to market price declines or the right to the lender to hedge and pledge the

---

[1]   Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Lending Agreement.

shares.   Rezk objected.  He expressed serious concerns that WMS  hedging, pledging  or selling significant Aeva equity could destabilize the company's stock, undermine investor confidence and effect company control.

33.    Instead, Rezk agreed to reduce the loan to collateral value to 25%, effectively doubling  the collateral—from $20 million to $40 million—in exchange for explicit protections in the Lending Agreement:

> [E]xcept under the Event of a Default, and/or in connection with Lender's hedging, ***Collateral will not be loaned, pledged, or re-pledged outside of the Lender or the structure itself***, or sold or traded in any exchange or over-the-counter transaction.  For the term of the [Lending Agreement], ***Lender shall not engage in any hedging activities with respect to the [Collateral]***.

Ex. A § 5(e) (emphasis added).

34.    Rezk also negotiated for Section 11(c), which states he is "allowed to vote the Share Collateral."  Ex. A § 11(c).

35.    The Lending Agreement also provided that "Collateral shall be booked to a segregated portfolio account established for Borrower under SRT Capital SPC Ltd" ("Collateral Account").  Ex. A at 20.

36.    Unbeknownst to Rezk, even as these negotiations progressed, Toros was already planning to hedge and liquidate the Collateral.  On May 2, 2022, Toros emailed Eric Maass, a senior employee with his company, Emerging Markets Intrinsic Ltd., and the point of contact between Toros and Rezk during negotiation of the Lending Agreement,[2] that Aeva's "stock w[ould] Drop 90% anyway." This revealed Toros had no faith in the collateral's value, yet was still willing to make the deal.  His intent to sell the shares was clear from the start.

---

[2]   Upon information and belief, Maass is and was located in state of Connecticut.

37.     Then, on May 27, 2022—nearly three weeks before executing the Lending Agreement—Toros sent an email to Maass with the heading "Aeva initial thoughts." Toros provided hedging materials and wrote: "This tells us to hedge day 1, Immediately if we are to capture interest + principal on a risk neutral basis (without being bullish or bearish on the stock)." Ex. C. This email was not a theoretical discussion. It was a blueprint for violating the very restrictions Rezk was negotiating.

38.     Toros was intimately involved with the negotiations and fully understood the significance of the provisions concerning hedging, selling, or liquidating the Collateral. Yet throughout the negotiations, Toros and his agents deliberately concealed their plan. Despite multiple discussions with Toros' agents—which were relayed to Toros—where Rezk expressed concerns about selling/hedging/liquidating the Collateral, Toros never disclosed that the fact that he viewed immediate liquidation as essential to the transaction. Nor did he reveal that he intended to begin selling Collateral the moment they were deposited into the Collateral Account. This deliberate silence was not accidental. It was a calculated strategy to induce Rezk to sign an agreement that Toros had already decided to breach.

39.     Had EAD known that Toros intended to immediately begin selling the Collateral, it never would have executed the Lending Agreement. The foundation of the deal rested on EAD doubling the Collateral from $20 million to $40 million in exchange for Section 5(e)'s categorical restrictions. EAD relied on Toros' representations when entrusting him with shares representing approximately 5% of Aeva's voting power at the time of the initial transfer.

**B. Rezk Takes Additional Steps to Ensure His Shares Will Not be Sold or Pledged**

40.     Rezk took deliberate steps to ensure compliance with the Lending Agreement. On June 21, 2022, Maass requested that Rezk transfer collateral to a Credit Suisse account in WMS's name. Rezk immediately objected. He reminded Maass that the Lending Agreement required

holding the Collateral in a segregated account under EAD's name.

41.    Maass acknowledged this obligation.  On June 23, 2022, he confirmed: "Shares won't go to W Management."  Instead, SRT would form a new entity, "100% owned and controlled by [EAD]," with the Collateral to be held in a "segregated account under [SRT's] umbrella established in the name of [EAD]."

42.    To further safeguard Mr. Rezk's rights, EAD and WMS agreed to an addendum to the Lending Agreement on June 28, 2022 (the "Information Rights Addendum", attached hereto as Ex. B).  It required Lender or Agent to "deliver to Borrower within three (3) business days of its request an account statement for the Collateral Account."  Ex. B at 1.  It also stated: "Within 180 business days after the date of this Addendum, the Lender will use its reasonable and commercial best efforts to obtain and deliver to the Borrower a copy of the custodian's written confirmation that the custodian will provide such information to the Borrower."  *Id*.

43.    As part of creating a segregated EAD account, WMS needed to create a segregated portfolio company ("SPC") under EAD's control that would serve as the accountholder.  Toros, through his agents, falsely represented on June 28, 2022 that both the SPC and required account had been established.  On that day, Maass emailed Mr. Rezk the account name, number, and a statement for the EAD Credit Suisse segregated account.  Ex. D.  The statement identified the "Client" for the account as "SPC EAD Group LLC."  *Id*.  The email also stated that Brown, Brothers, Harriman (BBH) would serve as the domestic custodian of the Collateral.  *Id*.  The next day, Mr. Rezk texted to confirm whether he was the owner of SPC EAD Group LLC.  Maass replied via text "that's correct."

44.    Internal WMS emails establish that as of June 30, 2022—two days after Defendants claimed the SPC existed—WMS and SRT were still actively working to form the entity.  In reality,

internal emails show Toros worked with Başar—his close friend and personal colleague—to open the segregated portfolio account before the SPC was even legally formed. Upon information and belief, this enabled Toros to bypass the segregation and ownership requirements of the Lending Agreement and gain unilateral control of the account.

### C. Rezk Transfers His Shares and Toros Immediately Begins Stealing Them From Rezk's Account and Selling Them

45. On July 8, 2022, EAD transferred 2.4 million Aeva shares (then valued at about $40 million, or $16.66 per share) into the Collateral Account.[3] E*TRADE's transaction confirmed that beneficial ownership remained with Rezk. Ex. E. The "Reason Code" read "Transfer of Customer Account," indicating a custodial, not ownership, transfer. *Id*. The confirmation also identified the "Rezk Family Trust" as the shares' beneficial owner. *Id*. On July 12, 2022, WMS issued a Loan Funding Letter confirming Collateral delivery and the $10,000,000 loan would be disbursed to EAD.

46. Behind the scenes, Toros had already positioned himself to execute his plan to sell the shares. Toros worked closely with Credit Suisse, personally emailing Credit Suisse relationship managers about Mina's account. In fact, when issues arose during the share transfer, E*TRADE—acting as Rezk's broker—requested a point of contact at Credit Suisse. The contact provided was Başar, Toros' long-time associate and private banker at Credit Suisse. Başar personally joined a call with E*TRADE and, according to an email from E*TRADE, met with them at least once to facilitate a transfer of the Collateral. Critically, Başar knew from these interactions that the transaction was a custodial transfer maintaining the same beneficial owner,

---

[3] In May 2024, Aeva effected a 1-for-5 reverse stock split. For consistency and ease of reference, unless otherwise noted, all share volumes and prices discussed in this letter reflect the post-split figures. For example, on July 8, 2022, Rezk transferred 12,000,000 shares at a price of $3.33 per share. After adjusting for the reverse split, this equates to a transfer of 2,400,000 shares at $16.66 per share, as described above.

not a change of title or ownership. Yet rather than serving as the neutral banking representative he purported to be, Başar exploited his position at Credit Suisse to conceal Toros' unauthorized control over the Collateral and to enable its immediate liquidation from an EAD-held account.

47.     Data from both the Depository Trust Company (DTC) and Bloomberg show that Toros and Credit Suisse began selling the shares from the Collateral Account immediately after it was deposited. Exs. G, H.

48.     The DTC data shows that on July 8, 2022, shortly after Rezk deposited the Collateral, BBH Aeva holdings increased from approximately 340,000 to 2.75 million shares, indicating BBH received the Collateral. One week later, BBH's Aeva holdings began plummeting. By September 23, 2022, BBH held just 900,000 shares. *Id.* at 25. Defendants had liquidated approximately 1.84 million of Rezk's shares in less than three months. The graph below visualizes BBH's Aeva holdings from July 1-December 31, 2022:



Brown Bros Harriman (BBH) Share Holdings - Aeva Technologies Inc.

49.     Bloomberg data exposes where these shares went and how Defendants sold them. Credit Suisse Securities trading data reveals a pattern that defies innocent explanation:

    a. **Before the collateral deposit** (June 6-July 8, 2022): Credit Suisse Securities traded an average of 9,729 Aeva shares daily.

    b. **Immediately after the deposit** (July 11-October 7, 2022): Credit Suisse Securities' daily trading volume exploded to 49,939 shares.

50.    **After the liquidation period** (October 10-November 11, 2022): Trading collapsed back to 12,089 shares daily. The graph below illustrates Credit Suisse Securities' extraordinary spike:



51.    The timing defies coincidence. Three days after Mr. Rezk deposited collateral, Credit Suisse Securities' daily trading volume exploded five-fold. No other market maker experienced similar fluctuations. Simultaneously, BBH's holdings plummeted by millions of shares. For 13 weeks, BBH's holdings fell at the rate needed to feed Credit Suisse Securities' inflated trading volume. When nearly all of BBH's excess holdings had been moved, Credit Suisse Securities' trading abruptly returned to normal levels. This is not a coincidence—these

movements clearly reflect the Collateral being stolen from EAD's segregated account and sold. This also violated the "Capital Shares" section of the Lending Agreement where the Company is supposed to file a prospectus with the SEC naming Lender as the selling stockholder.

52.     Rezk remained unaware of this systematic liquidation.  Rezk only learned about these transfers in July 2025 through his own independent research.  Toros, Başar, Credit Suisse, and Credit Suisse Securities all failed to notify him that shares were being sold from the segregated account bearing EAD's name.

53.     This massive unauthorized liquidation devastated Aeva's share price.  Credit Suisse Securities flooded the market with approximately 54,266 shares daily from July 1 to September 23, 2022.  Given Aeva's average daily volume of 62,000 shares during that period, these unauthorized sales represented nearly all Aeva trading volume—effectively flooding the market with Rezk's shares and depressing the value of the shares. The chart below compares BBH's shareholdings with Aeva's share price and clearly indicates a correlation between the sales and the decline in Aeva's share price.



54. On July 11, 2022, Maass provided Rezk with a Credit Suisse account statement for the Collateral Account, confirming that 2,400,000 Aeva shares valued at $43,920,000 had been transferred to the account held by SPC EAD Group LLC. Ex. F. However, a comparison with the initial June 28, 2022 statement reveals multiple signs that Toros and Credit Suisse manipulated the statement:

    a. The July 11 statement was scanned from a physical copy, not produced electronically like the initial statement;

    b. The table of contents references pages 6 and 8, but the document contains only 4 pages;

    c. The last page's format differs from the initial statement's positions page, suggesting insertion from another document;

    d. The last page includes an "Exported on" stamp appearing nowhere else in the document.

**D. Toros Exploits His Own Misconduct to Extract Additional Collateral While Continuing The Fraudulent Scheme**

55. As Toros' supply of Aeva stock ran low, he exploited the very price decline his unauthorized sales had created to extract additional collateral from Rezk. The Lending Agreement permitted WMS to make a Collateral Call when Aeva's share price fell below 60% of the Initial Price. Ex. A at 3-4. By September 22, 2022, after weeks of Toros and Credit Suisse continuing to flood the thinly traded market with Rezk's stock, the share price had plunged from $16.75 to $9.90, slipping just under that trigger. Without disclosing that he and Credit Suisse were directly responsible for the drop, Toros seized this opportunity and instructed his Maass to email Rezk that same day, issuing a Collateral Call for additional Aeva shares.

56. Rezk promptly complied, transferring 460,000 additional shares to the Collateral

Account on September 23, 2022.  Rather than leaving this transfer to routine processing, Toros personally oversaw every aspect of the Collateral Call—communicating regularly with both Rezk and WMS employees, coordinating directly with Credit Suisse, and closely monitoring settlement progress.

57.     DTC data reveals Toros immediately continued his unauthorized sales pattern.  On September 24, 2022, DTC data shows increased Aeva shares in BBH's custody, reflecting the Top-Up Amount transfer.  By October 7, the shares had dropped to six-hundred-ninety-two thousand. Credit Suisse Securities sales of Aeva shares also spiked in the weeks after the Top-Up Amount transfer.  The shares continued to steadily drop through November 13, 2022.

58.     When making this Collateral Call, Toros concealed material facts that would have fundamentally altered Rezk's response.  Neither Toros nor his agents disclosed that Toros had been systematically stealing and liquidating shares from the Collateral Account.  By September 22, 2022, Toros had already sold millions of Rezk's shares.  Nor did he inform Rezk that he intended to steal and liquidate the very shares obtained through the Collateral Call.  This massive theft continued even as Toros cynically demanded additional shares for the account he was actively plundering.

59.     More egregiously, Toros failed to disclose that his own unauthorized selling had materially contributed to—if not directly caused—the share price decline that now formed the basis for the Collateral Call.  The data is damning: Toros had been dumping an average of 54,000 shares per day into a market that, as a result, averaged 62,000 shares in daily trading volume. Toros' sale thus comprised more than 85% of Aeva trading.  This flood of unauthorized selling had driven Aeva's stock down 39% since Rezk deposited collateral.  Yet Toros presented the decline as an independent market event requiring additional collateral, while concealing he had

engineered the conditions necessitating the margin call.

60.     This omission transformed a routine contractual provision into an instrument of fraud. Toros demanded Rezk provide more shares to cover losses Toros had illegally caused—while planning to steal these additional shares too. It was a perverse cycle: steal shares, drive down the price through illegal selling, use the depressed price to demand more shares, then steal those shares too.

61.     Rezk, unaware of this ongoing theft and manipulation, acted in good faith to honor what he believed were legitimate obligations under the Lending Agreement. Had Rezk known the truth—that Toros was actively stealing from the Collateral Account, that demanded shares had already been sold illegally, and that Toros' illegal conduct had caused the price decline triggering the collateral call—he never would have provided additional collateral. No one would have deposited additional assets into an account from which the custodian was actively stealing. Toros' material omissions and fraudulent concealment procured Rezk's consent to the Collateral Call.

62.     On or around October 4, 2022, Rezk received an October 4, 2022 Credit Suisse account statement for the Collateral Account. Ex. G. The statement identified "SPC EAD Group LLC" as "Client" and confirmed the account held 2,860,000 shares, reflecting the inclusion of the 460,000 shares Mr. Rezk had transferred in response to the Collateral Call.

63.     Like the July 11 statement, comparison with the initial June 28, 2022 statement reveals multiple signs that Toros and Credit Suisse had manipulated the statement:

> a.  The October 4 statement was scanned from a physical copy, not produced electronically like the initial statement;
>
> b.  The table of contents references pages 6 and 8, but the document contains only 4 pages;

    c.   The last page's format differs from the initial statement's positions page, suggesting insertion from another document;

    d.   The last page includes an "Exported on" stamp appearing nowhere else in the October 4 statement.

64.    Toros' deception is further illustrated by events two weeks later.  On October 18, 2022, believing he held 2.86 million shares as shown on the doctored statement, Rezk emailed Maass with voting instructions for an Aeva shareholder meeting.  "You might have gotten the proxy request vote for Aeva the shares in the collateral," Rezk wrote. "Can you please vote as per the board recommendation for all the shares you have (14,300,000 shares [2.86 million post-stock split])."  Ex. H.  He requested confirmation once the votes were cast.  Maass responded that his "desk has reached out to do this" and promised to confirm completion.  This exchange reveals the cruel reality of Toros' fraud: while Rezk believed he was directing the vote of 2.86 million shares, Toros knew they had already liquidated over 1.8 million of them.  Yet he maintained the charade, accepting voting instructions for shares that no longer existed.

**E.  Toros Continues His Pattern of Fraud Through a Second Collateral Call and Unauthorized Transfer**

65.    Between September 24, 2022 and April 2023, Toros continued selling Collateral Shares while Aeva's price plummeted. By April 5, 2023, Aeva traded at $5.15—down 71% from $18.30 when defendants began their unauthorized sales.

66.    Toros repeated his exploitative scheme, sending Rezk a letter on April 5, 2023 that again capitalized on the depressed share price his own misconduct had created.  The letter stated that Aeva's decline left WMS "with significant losses and no other option but to fire sale the collateral."  That statement was only possible if WMS still held the Aeva shares as collateral.  In truth, by that date Toros had already sold the majority or all of the shares from the Collateral

Account, leaving nothing left to "fire sale."   This letter is a direct evidence of misrepresentation: while secretly liquidating the collateral, WMS falsely represented it remained intact.  Toros also concealed that his unauthorized trading was directly contributing to the 71% price decline that now formed the basis for demanding even more Collateral.

67.     Unaware that Toros was systematically liquidating his collateral and directly causing the price decline, Rezk negotiated in good faith.  Although Rezk disputed his obligation to provide an additional Top-Up Amount, the parties entered into a Letter Agreement dated May 1, 2023 to resolve the dispute (the "Top-Up Addendum").  Ex.  I.  Under the Top-Up Addendum, EAD agreed to deliver 700,000 additional Aeva shares as collateral to support the loan.  Most significantly for Rezk's protection, the Top-Up Addendum included a crucial provision regarding these additional shares: "Lender will return all such Additional Shares to Borrower on the first Exchange Business Day that occurs after the VWAP of a Capital Share has equaled or exceeded $2.00 per Capital Share [$10 post-split] for the immediately preceding ten (10) consecutive Exchange Business Days."  *Id.*

68.     Had Rezk known that Toros was liquidating his shares illegally and that this selling had materially contributed to the price decline, he never would have never provided additional collateral.  Toros' concealment of his ongoing breach induced Rezk to transfer shares that would themselves become victims of Toros' unlawful scheme.

69.     The transfer process itself revealed Toros's continued deception. By that time, Başar—Toros's longtime insider at Credit Suisse—had left the bank, which upon information and belief deprived Toros of the internal access he had previously exploited to misappropriate shares. On information and belief, Başar exited Credit Suisse in May 2023.

70.     Without this internal advantage, Toros sought alternative channels.  On May 1,

2023, Maass proposed sending the additional 700,000 Aeva shares to WMS's account at EFG Bank—which would have given Toros direct access to the Collateral.  Rezk insisted the shares remain segregated under EAD's name.  Realizing he could not replicate his prior deceptive scheme at EFG Bank, Toros relented and requested the shares be sent to an EAD segregated account at Defendant İş Yatırım, with Citibank as custodian, rather than the original Collateral Account.  On May 2, 2023, the Senior WMS Employee confirmed this arrangement via email.  Ex. J.  Rezk transferred the shares that same day.

71.    Even then, Toros continued to obscure critical information. The Secure Settlement Instructions (SSI) provided to facilitate the transfer listed only Citibank—intentionally omitting any mention of İş Yatırım.  This gave the false impression that Citibank, a U.S.-accredited and reputable institution, was the final destination of the shares, thereby lulling Rezk into a false sense of security.  In truth, Citibank was merely acting as U.S. custodian, and the shares were being routed to an account controlled by Defendant İş Yatırım.  The name "İş Yatırım" appeared nowhere in the email or the SSI email.  It was only later—upon reviewing internal settlement-related emails from that time—that Rezk's team discovered İş Yatırım's involvement in the transaction.  This omission was no accident.  It was a calculated effort to mislead and conceal who would ultimately control the account and to obscure that the true recipient was a Turkish brokerage, not a U.S.-regulated bank.

72.    Despite telling Rezk that the shares would be sent to Citibank, in December 2024, Maass provided a December 3, 2024 Credit Suisse statement that showed the Collateral Account held 3.56 million shares, ostensibly representing all shares provided as collateral.  Ex. K.  This statement is clearly false, as Rezk learned from Credit Suisse *that the account had been closed since April 2023.*  Unsurprisingly, this statement bears the hallmarks of falsification.  Like the July

11, 2022 and October 4, 2022 statements, the December 3, 2024 statement contains identical irregularities—including mismatched formatting and suspicious pagination—suggesting a systematic pattern of document manipulation.

73.    Toros not only forged statements showing that shares were at Credit Suisse, but data from DTC and Bloomburg shows that he sold the shares sent to İş Yatırım.  Upon information and belief, İş Yatırım knew that the shares were to be held in a segregated account, yet allowed Toros to liquidate the account and sell the shares anyways.

74.    The DTC data shows that on the week ending May 19, 2023, shortly after Rezk deposited the added Collateral, Citibank N.A holdings increased by 707,469 shares from approximately 1,447,239 to 2,154,708 shares, indicating Citibank N.A received the Collateral. One week later, Citibank N.A's Aeva holdings began plummeting.  By November 24, 2023, Citibank N.A held just 1,388,742 shares.  Defendants had liquidated all the collateral in about six-months.  The graph below visualizes Citibank N.A Aeva holdings from May 5, 2023 to December 8, 2023:



75.    This sustained, month-after-month depletion of Citibank N.A.'s Aeva holdings—executed at the direction of İş Yatırım and Toros—steadily dumped millions of shares into the open market over a six-month period, exerting continuous downward pressure on the stock.  As the chart below shows, Citibank N.A.'s declining DTC position closely tracks the drop in AEVA's market price, underscoring the correlation between their unauthorized sales and the destruction of shareholder value by almost 40%.



76.     As discussed earlier, this pattern was not isolated to 2023. The historical trading pattern further reveals two distinct selling waves.  In the first, Toros' aggressive liquidation directly drove down Aeva's share price, creating the pretext for a collateral call and the seizure of additional shares.  In the second, occurring more than a year later, Toros resumed large-scale selling—not to trigger a collateral top-up, but to quietly exit his remaining stolen position before the fraud could be uncovered.  In both periods, the selling coincided with steep price declines, demonstrating that the impact on Aeva's market value was both immediate and severe.



77.     Toros' lies continued throughout this time.  On December 8, 2023, still believing his shares remained safely in custody based on doctored statements, Rezk sent voting instructions to Maass.  By this point, Defendants had liquidated the vast majority of the Collateral.  Yet Toros continued the charade, accepting voting instructions for phantom shares while knowing they had systematically drained the accounts.

### F. Toros Attempts to Settle the Loan to Conceal the Fraud

78.     Facing mounting pressure and evidence of their fraud, Toros continued his pattern of deception by attempting to settle the matter while concealing the true scope of their theft. During December 2024, Rezk and Maass had a call to discuss ways to pay down the loan. On December 31, 2024, Maass sent Rezk a draft "Margin Lending Wind-Up Agreement." Ex. L.

79.     The proposed Wind-Up Agreement was a calculated attempt to legitimize the theft. The draft agreement acknowledged that "the principal amount due on the loan is $10,000,000.00" and claimed additional interest of $2,861,136.99, for total "Borrower's Obligations" of $12,861,136.99.  *Id*.  It proposed that WMS would "liquidate the [] Collateral" and apply the proceeds first to liquidation expenses, then to these purported obligations.  *Id*.

80.     Most tellingly, the proposed agreement contained an extraordinarily broad release. It required Plaintiff to "release, waive, acquit, and discharge" all claims "arising from the beginning of time up to and including the Effective Date." This specifically included "any claim related to, arising out of, or in connection with the Share Collateral." *Id*. The release explicitly acknowledged that Plaintiff might "hereafter discover facts in addition to or different from those which they now know to be true." Yet it required Plaintiff to waive all rights to pursue claims based on such newly discovered facts. *Id*.

81.     This proposed Wind-Up Agreement was fundamentally fraudulent. It was premised on fiction that Defendants still possessed the Collateral to liquidate. In reality, Toros knew Defendants had already stolen and liquidated the vast majority of Plaintiff's shares over the preceding two and a half years. The Wind-Up Agreement's reference to future liquidation was a sham designed to conceal that the theft had already occurred. It was never signed, never executed, and remains damning evidence of Defendants' intent to conceal their crimes.

## G. Toros' Scheme Unravels as He Flees the United States and Admits to Liquidating the Collateral

82.     In early 2025, Aeva's share price surged. As of May 16, 2025, the 10-day VWAP reached $13.15 per share, satisfying both the Top-Up Addendum's conditions for the return to EAD of approximately 700,000 shares.

83.     On May 19, 2025, Rezk emailed Maass demanding that WMS initiate the return of his excess Collateral. Over the following two weeks, Rezk repeatedly followed up. WMS deflected these requests, citing unexplained delays from the bank and the DTC.[4]

84.     Upon information and belief, during this time, on or around May 31, 2025, Toros

---

[4]   On June 25, 2025 at the latest, the Lending Agreement's provisions for returning all Top-Up Amounts had been satisfied, as the VWAP of the shares had surged above the Initial Price for a fifteen-day period five days prior.

fled the United States for Turkey, followed shortly thereafter by his family.  His sudden and unexplained flight is consistent with an effort to evade accountability for the fraud he orchestrated. Upon information and belief, he has not returned to the United States.

85.    On June 3, 2025, four days after Toros left the United States, Toros sent Rezk a letter confirming the fraud.  Ex. M.  In the letter, Toros stated that they "directed the custodian, UBS, to deliver those shares to you."  *Id*.  "The custodian has informed us *that the shares have been liquidated as a result of an unmet margin obligation on the part of [W Management].*"  *Id*. (emphasis added).

86.    In a subsequent phone call with Rezk, Toros made no effort to justify his actions. He characterized the liquidation as "a f**kup on my part" and conceded that "the shares should not have been pledged."  Yet even this admission contained lies.  Toros claimed the Collateral had been liquidated in "January or February" 2025—a claim contradicted by the data showing the sales began the day Rezk deposited shares on July 8, 2022.

87.    Maass—who had served as Rezk's primary point of contact throughout the loan— echoed this view, stating unequivocally that "the agreement is crystal clear" in prohibiting WMS from pledging the Collateral.  Frustrated by Toros' conduct and the lack of transparency, Maass informed Rezk that he had resigned from all positions at Toros-affiliated entities, thereby ending a nearly 15-year professional relationship with Toros.

88.    Despite claiming during the call that he "takes responsibility for this" and "will fix this," Toros has since taken steps to conceal himself and his assets.  In addition to fleeing to Turkey, Toros rendered himself unreachable.  Rezk has made multiple attempts via email and phone to contact Toros.  All have failed.

89.    Moreover, despite claiming on a call that he was "very upset with the bank," Toros

and WMS have refused to provide account statements reflecting the liquidation or facilitate communication with the banks holding assets.  These requests were not merely reasonable—they were expressly required by the Information Rights Addendum.  Specifically, the addendum obligated WMS to provide account statements within three business days and facilitate custodian communication. Ex. B.  Toros' continued refusal demonstrates his intent to conceal the full extent of his misconduct.

90.    Attempts to obtain additional information directly from UBS (formerly Credit Suisse) have proven difficult.  In a recent effort, Rezk traveled to the Geneva branch address on the statement, bringing the EAD Group formation documents and EAD Group certificate of good standing. ***There, bank representatives informed him that the segregated account that is in EAD Group name had been closed since April 2023***—approximately one month before Egemen Başar's departure from the bank.  The closure, executed without any prior notice to Rezk, is no ordinary administrative event.  It is a glaring red flag for deliberate evidence destruction — an intentional move to erase transaction history, obstruct accountability, and sabotage any investigation into the unauthorized liquidation and transfer of Rezk's shares.  Critically, the fact that the account ceased to exist after April 2023 proves beyond a reasonable doubt that any Credit Suisse account statements dated after that closure—including those sent to Rezk—were forged.

91.    On June 23, 2025 EAD filed a demand for arbitration against WMS with the International Chamber of Commerce.  On September 11, 2025, EAD filed an amended arbitration demand elaborating on Toros' fraudulent activity and intent.  A mere two days later, on September 13, 2025, Defendant Yasemin Toros filed for the dissolution of one of WMS's wholly owned subsidiaries in the UK, also named W Management Services Ltd.  Yasemin Toros—the subsidiary's sole director—was the signatory to the dissolution application.  As part of that

application, Yasemin Toros certified that the subsidiary was not subject to any pending legal actions. Upon information and belief, Yasemin Toros filed for dissolution upon agreement with and at the direction of Toros, in order to make it more difficult for EAD to reach WMS's assets to satisfy an eventual judgment in its favor.

## COUNT I

### Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (against Toros, Başar, Credit Suisse and Yasemin Toros)

92. Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 91 above as if fully set forth herein.

93. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

94. Defendants Bulent Toros, Egemen Başar, Credit Suisse, and Yasemin Toros (together the "RICO Defendants") are individuals or corporate entities capable of, and in fact holding, legal or beneficial interest in property, and therefore "persons" under 18 U.S.C. §1961(3) and 1 U.S.C. §1.

95. ***The Enterprise:*** The "Enterprise" is the association-in-fact of Defendants Bulent Toros, WMS, Egemen Başar, Credit Suisse, and Yasemin Toros and their employees and agents, formed for the common purpose of unlawfully and deceptively defrauding EAD to extract shares in Aeva Technologies over the course of several months while secretly liquidating the shares in violation of the Lending Agreement.

96. At all times the Enterprise has sought to enrich its members at the expense of EAD, including secretly liquidating the Collateral in violation of the Lending Agreement and repeatedly

acting to conceal its fraudulent activity through additional fraudulent means, including forging bank account statements and other transmissions through acts of deception, omissions, and campaigns of misinformation in furtherance of the Enterprise.

97.     As discussed above, the members of the Enterprise have not only deprived EAD of shares which are rightfully its own in violation of the Lending Agreement, it has also silenced its voice at annual shareholder meetings.

98.     The Enterprise could not accomplish its purpose without the coordinated activity of its members.

99.     The Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

100.    ***Pattern of Racketeering Activity:*** Over the course at least three years, the Enterprise has been engaged in activities that affect interstate commerce.  The Enterprise has been continuous, longstanding, and open ended.  It continues today.[5]

101.    The RICO Defendants, individually and as part of the Enterprise, engaged directly or indirectly in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The RICO Defendants, acting individually and as part of the Enterprise, devised the scheme in order to defraud and to obtain money or property by means of false or fraudulent pretenses, representations, and omissions.  Each RICO Defendant's participation was crucial to the racketeering activity.

102.    Defendant Bulent Toros negotiated the Lending Agreement and promised that he would not hedge or otherwise pledge the Aeva shares secured as collateral.  Immediately upon

---

[5]  Indeed, even as far back as 2015, Toros was engaging in activities remarkably similar to the activities that form the basis of this Complaint, which demonstrates an open-ended pattern of continuity as they represent the Defendants' ongoing and regular way of conducting their business and/or that the nature of Defendants' conduct itself implies a threat of continued criminal activity. *See, e.g., Carbures Europe, S.A.. et al v. Emerging Markets Intrinsic Cayman Ltd. et al*, 653892/2015 (N.Y. Sup. Ct.); *Domenica Nominees Pty. Ltd. et al v. Emerging Markets Intrinsic Cayman Ltd. et al*, Cas No. 16-cv-09016 (S.D.N.Y.) (among others).

receiving the shares, Defendant Toros began to facilitate their liquidation. As the stock price sank due to Toros' activities, he used the Lending Agreement as an instrument of fraud to deprive EAD of additional Aeva shares. All the while, Defendant Toros facilitated the doctoring of account statements to perpetuate the charade that EAD's collateral shares remained untouched in a Credit Suisse account for which Plaintiff was supposedly the beneficial owner.

103. Defendants Credit Suisse and Başar facilitated the Enterprise's racketeering activities while knowing and intending both that EAD's shares were held in a segregated account in Plaintiff's name and massive volumes of shares were being liquidated without Plaintiff's permission immediately after deposit. Defendants Credit Suisse and Başar substantially assisted in the Enterprise by (i) facilitating transfers of the shares to third parties; (ii) executing the unauthorized sales, (iii) providing manipulated account statements that concealed the liquidations; and (iv) refusing to provide information to Plaintiff when requested. Credit Suisse was a central figure in the Enterprise and racketeering activity alleged herein, and it received a benefit through Başar's actions in support of the Enterprise's racketeering activity.

104. Defendant Yasemin Toros participated in the Enterprise through her conspiracy to shield Toros' assets from the ICC's reach. Once EAD realized Toros' deception and sought to use its bargained for contractual remedies to seek redress, Defendant Yasemin Toros began dissolving the assets of WMS to make them harder to reach for recovery. In particular, on or around September 13, 2025, Defendant Yasemin Toros filed for dissolution of W Management Services Ltd, a wholly owned subsidiary of WMS (which itself is wholly owned by Toros), notwithstanding the pending arbitration against WMS, in order to make it more difficult to reach WMS and Toros' assets in the event of a negative judgment in the ICC arbitration. Likewise, she has participated in the transfer of control from Toros to herself in SRT Capital SPC UK Ltd., which is the subsidiary

of another respondent in the ICC arbitration, SRT.

105.    The pattern of racketeering activity consisted of the RICO Defendants committing, or directing others to commit, numerous acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, bank fraud in violation of 18 U.S.C. § 1344, and transportation and sale of stolen property in violation of 18 U.S.C. §§ 2314 and 2315, including but not limited to:

a.  On or around May through June 2022, in furtherance of the scheme to defraud, Toros made fraudulent material misrepresentations and omissions to induce Plaintiff to enter into the Lending Agreement by promising to hold Plaintiff's Aeva shares as collateral in a bank account at Credit Suisse in its name with promises that those shares would not be transferred, pledged, sold or traded except in limited circumstances not applicable here.

b.  On or around June 28, 2022, in furtherance of the scheme to defraud, Toros, Başar and Credit Suisse fraudulently opened a Credit Suisse bank account in the name of SPC EAD Group LLC without proper documentation as that entity had not yet been legally created.

c.  Between July 8, 2022 and September 23, 2022, in furtherance of the scheme to defraud, Toros, Başar, and Credit Suisse worked together to sell, without permission, 1.84 million Aeva shares owned by EAD, through one or multiple sales.

d.  On or around July 11, 2022, in furtherance of the scheme to defraud, Toros, Başar, and Credit Suisse created and sent to Plaintiff a false Credit Suisse account statement that said that the Collateral was safely held in a segregated account under Plaintiff's name in order to cover up the fact that

34

Defendants had already begun to liquidate Plaintiff's shares.

e.  On or around September 22, 2022, in furtherance of the scheme to defraud, Toros made fraudulent and material misrepresentations and omissions regarding the status of the Enterprise's Aeva holdings and the reason for the drop in Aeva share price in order to extract additional Aeva shares from Plaintiff. Again, Toros did so with fraudulent promises that those shares would not be transferred, pledged, sold or traded except in limited circumstances not applicable here.

f.  Between September 24, 2022 and November 13, 2022, in furtherance of the scheme to defraud, Toros, Başar, and Credit Suisse worked together to sell, without permission, Aeva shares owned by EAD, through one or multiple sales.

g.  On or around October 4, 2022, in furtherance of the scheme to defraud, Toros, Başar, and Credit Suisse created and sent to Plaintiff a false Credit Suisse account statement that said that the Collateral was safely held in a segregated account under Plaintiff's name in order to cover up the fact that Defendants had already begun to liquidate Plaintiff's shares.

h.  On or around April 5, 2023, in furtherance of the scheme to defraud, Toros made fraudulent material misrepresentations and omissions regarding the status of the Enterprise's Aeva holdings and the reason for the drop in Aeva share price in order to extract additional Aeva shares from Plaintiff. Again, Toros did so with fraudulent promises that those shares would not be transferred, pledged, sold or traded except in limited circumstances not

applicable here.

i.  Between May 19, 2023 and November 24, 2023, in furtherance of the scheme to defraud, Toros sold, without permission, nearly 700,000 million Aeva shares owned by EAD, through one or multiple sales.

j.  On or around March 12, 2024, in furtherance of the scheme to defraud, Toros, Başar, and Credit Suisse created and sent to Plaintiff a false Credit Suisse account statement that said that the collateral was safely held in a segregated account under Plaintiff's name in order to cover up the fact that Defendants had already begun to liquidate Plaintiff's shares.

k.  On or around December 3, 2024, in furtherance of the scheme to defraud, Toros, Başar, and Credit Suisse created and sent to Plaintiff a false Credit Suisse account statement that said that the collateral was safely held in a segregated account under Plaintiff's name in order to cover up the fact that Defendants had already begun to liquidate Plaintiff's shares and that the account had been closed since April 2023.

106.    The aforementioned acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 et seq. These acts of racketeering were a part of the RICO Defendants' regular way of doing business. The RICO Defendants each benefitted from the operation of the scheme.

107.    ***Relationship of Pattern of Racketeering Activity to the Enterprise***: The pattern of racketeering activity described above is integral to the Enterprise's scheme to enrich its members by liquidating EAD's collateral, while maintaining the illusion that they still possessed the shares, so that they may extract further collateral from EAD.  Without engaging in mail fraud or wire

fraud or forgery, the RICO Defendants would not have been able to illegally enrich themselves at Plaintiff's expense.

108.    The Enterprise described herein was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

109.    Plaintiff has been injured in its business and property and has standing to sue the RICO Defendants and recover damages and costs under 18 U.S.C. § 1962(c).  By virtue of these violations of 18 U.S.C. § 1962(c), and under 18 U.S.C. § 1964(c), Defendants are liable to EAD for actual damages, treble damages, the cost of this suit, and attorneys' fees in an amount to be determined at trial.

### COUNT II
### Violation of 18 U.S.C. § 1962(d)
### (against Toros, Başar, Credit Suisse and Yasemin Toros)

110.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 109 above as if fully set forth herein.

111.    18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

112.    The RICO Defendants agreed and conspired with the members of the Enterprise to participate in, or to facilitate the commission of, predicate acts as stated above and agreed and conspired to facilitate the acts leading to the substantive offense of conducting the affairs of the Enterprise through a pattern of racketeering activity, which included the acts as alleged above, in violation of 18 U.S.C. § 1962(d).

113.    The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

114.    As demonstrated in detail above, the RICO Defendants have engaged in numerous overt and predicate racketeering acts in furtherance of the conspiracy, including transmitting multiple forged bank account statements, multiple instances of mail and/or wire fraud, and transportation and sale of stolen property, in furtherance of the scheme to defraud.

115.    The nature of the above-described RICO scheme indicates that the members of the Enterprise not only agreed to the objective of a RICO conspiracy under 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) but also that they were aware that their ongoing fraud has been and is part of an overall pattern of racketeering activity.

116.    As a direct and proximate cause of the RICO Defendants' conspiracy to participate in the conduct of the affairs of the Enterprise alleged herein, Plaintiff has been and continues to be injured in its business and property as set forth above.

### COUNT III
**Fraud and Conspiracy to Commit Fraud**
**(against Toros, Başar, Credit Suisse, Credit Suisse Securities, İş Yatırım, Yasemin Toros)**

117.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 116 above as if fully set forth herein.

**A.    Fraud in the Inducement of the Lending Agreement**

118.    Toros made material misrepresentations and omissions to induce Plaintiff to enter the Lending Agreement.

119.    While negotiating in May and June 2022, Toros actively concealed his intent to immediately transfer, pledge, sell, and/or trade the Collateral shares upon receipt. This violated the very provisions he was negotiating.

120.    These omissions were material.  Plaintiff doubled the Collateral from $20 million to $40 million specifically for Section 5(e)'s restrictions on hedging and trading.  Had Toros disclosed his true intentions, Plaintiff never would have provided any collateral.

121.    Toros knew his concealment was false when made.  While negotiating restrictions on hedging and trading, he simultaneously prepared to violate them and began liquidating Rezk's account immediately after the Collateral was deposited.

122.    Plaintiff reasonably relied on Toros' omissions.  Plaintiff had no reason to suspect Toros was instructing his team to prepare immediate hedging while negotiating explicit prohibitions.  Plaintiff demonstrated reliance by doubling the collateral for the protective provisions.

123.    As a direct and proximate result of Toros' fraud in the inducement, Plaintiff has suffered damages including, but not limited to:

       a.   The loss of 2.4 million shares of Aeva stock worth approximately $40 million at the time of transfer;

       b.   The deprivation of voting rights on approximately 6.47% of Aeva's outstanding shares;

       c.   The loss of the opportunity to benefit from Aeva's subsequent stock price appreciation

       d.   Other consequential damages to be proven at trial.

**B.    Fraud in Connection with the September 2022 Collateral Call**

124.    On September 22, 2022, Toros made material misrepresentations and omissions to fraudulently induce additional collateral.

125.    In demanding the Collateral Call, Toros failed to disclose that (i) he had systematically stolen and liquidated shares from the Collateral Account since July 2022, violating Section 5(e); (ii) by September 22, 2022, he had already sold approximately 1.84 million shares; (iii) his massive unauthorized selling—averaging 54,000 shares daily in a market with only 62,000 average daily volume—materially contributed to the 39% price decline forming the margin call's

basis; and (iv) he intended to steal and liquidate any additional shares provided.

126.    These omissions were material.  No one would provide additional collateral to a custodian actively stealing from the account.  That Toros' illegal conduct caused the price decline necessitating the margin call was quintessentially material.

127.    Toros knew these omissions were false when made.  He personally orchestrated the unauthorized sales and knew exactly how many shares were liquidated and the impact on Aeva's price.

128.    Toros made these omissions with fraudulent intent.  He deliberately concealed ongoing theft to trick Plaintiff into providing more shares to steal—a perverse cycle of theft, price manipulation, and demands for more collateral.

129.    Plaintiff reasonably relied on Toros' omissions.  Acting in good faith and believing the Collateral Call legitimate, Plaintiff promptly transferred 460,000 additional shares on September 23, 2022.  Plaintiff had no reason to suspect Toros was stealing.

130.    As a direct and proximate result of this fraud, Plaintiff suffered additional damages including the loss of 460,000 shares and the subsequent decline in value of those shares.

     **C.**     **Fraud in Connection with the April 2023 Top-Up Demand**

131.    On April 5, 2023, Toros again made material misrepresentations and omissions to fraudulently induce Plaintiff to provide additional collateral.

132.    In his April 5, 2023 letter demanding additional shares, Toros represented that WMS faced the risk of having to "fire sale the collateral" if Plaintiff did not comply. That assertion necessarily implied that WMS still held the Aeva shares as collateral. In truth, by April 2023, Toros had already liquidated millions of those shares and had nothing left to "fire sale."

133.    Toros also omitted material facts, including that (i) he had continued stealing and liquidating shares from September 2022 to April 2023; (ii) his ongoing unauthorized sales

contributed to the 71% price decline from $18.30 to $5.15; (iii) he had already stolen and sold millions of shares; and (iv) he intended to steal and liquidate any additional shares provided.

134. These omissions were material for the same reasons stated above—no reasonable person would provide additional assets to someone actively stealing from them.

135. Toros knew these statements and omissions were false when made, as he was personally directing the ongoing liquidation scheme.

136. Toros made these misrepresentations and omissions with intent to defraud, seeking to extract even more shares through deception.

137. Plaintiff reasonably relied on these omissions and, although disputing the obligation, entered into the Top-Up Addendum on May 1, 2023, agreeing to provide an additional 700,000 shares (3.5 million pre-split).

138. As a direct and proximate result of this fraud, Plaintiff suffered additional damages including the loss of 700,000 shares and related consequential damages.

### D.    Common Law Fraud Through Ongoing Concealment

139. Throughout the entire period from June 2022 through June 2025, Toros engaged in a continuous pattern of fraud by actively concealing his theft and liquidation of the Collateral while maintaining the pretense that the shares remained safely in the segregated account.

140. Toros made affirmative misrepresentations through manipulated account statements falsely showing Collateral remained when he knew it was liquidated.

141. Toros had a duty to disclose his unauthorized trading based on multiple grounds. First, Toros and Plaintiff shared a special relationship of trust and confidence. Plaintiff entrusted Toros with $40 million in shares based on negotiated protections. Toros accepted this trust knowing Plaintiff relied on his representations about safeguarding the collateral. This relationship imposed a duty to disclose material facts affecting the entrusted property. Second, once Toros

chose to provide account statements, he assumed a duty to ensure their accuracy and completeness. By showing shares as "held" while concealing their liquidation, Toros created a false impression that the shares were safely held.  Third, Toros possessed exclusive knowledge of material facts that Plaintiff could not reasonably discover.  Plaintiff had no way to independently verify the shares' status in the segregated account Toros controlled.

142.    Only when cornered in June 2025 did Toros finally admit his fraud, characterizing it as "a f**kup" and conceding "the shares should not have been pledged."

143.    As a direct and proximate result of Toros' fraudulent scheme, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $70 million, plus consequential damages including lost voting rights, lost opportunity to benefit from appreciation, and other damages.

144.    Toros' conduct was willful, wanton, and malicious, demonstrating a complete disregard for Plaintiff's rights.  Plaintiff is therefore entitled to punitive damages in an amount sufficient to punish Toros and deter similar conduct.

**E.    Credit Suisse, Credit Suisse Securities', and Başar's Knowing Assistance**

145.    Credit Suisse and Credit Suisse Securities had actual knowledge of facts indicating fraud. They knew: (i) the shares were held in a segregated account in Plaintiff's name, transferred to Credit Suisse for custody only, not as Toros's property, and (ii) massive volumes of shares were being liquidated without Plaintiff's permission immediately after deposit.

146.    Upon information and belief, Credit Suisse (through Başar) substantially assisted in Toros' fraud by (i) facilitating transfers to third parties; (ii) providing manipulated account statements that concealed the liquidations; and (iii) refusing to provide information to Plaintiff when demanded.

147.    Credit Suisse Securities substantially assisted in Toros' fraud, upon information and belief, by executing the unauthorized sales.

**F.    İş Yatırım's Knowing Assistance**

148.    Defendant IsYatirim received 700,000 Aeva shares in May 2023 to be held in a segregated account under Plaintiff's name. Upon information and belief, İş Yatırım knew these shares were collateral subject to specific return conditions under the Top-Up Addendum.

149.    Upon information and belief, despite this knowledge, İş Yatırım substantially assisted the fraud by transferring these shares without Plaintiff's authorization, resulting in the unauthorized liquidation of approximately 700,000 shares between October 2023 and April 2025.

**G.    Yasemin Toros' Knowing Assistance**

150.    Defendant Yasemin Toros is the sole director of W Management Services Ltd UK, a wholly-owned subsidiary of WMS, which itself is owned entirely by Toros.  On June 23, 2025, EAD, through Rezk, filed a demand for arbitration in the International Chamber of Commerce against WMS.  On September 11, 2025, EAD, through Rezk, filed an amended arbitration demand describing, for the first time, all of Toros' fraudulent conduct as also described herein.  Just two days later, on September 13, 2025, Yasemin Toros filed to dissolve W Management Services LTD, while certifying that the company was not subject to any pending legal action.

151.    Upon information and belief, Yasemin Toros dissolved W Management Services Ltd UK at the direction of and in agreement with Toros, and fraudulently certified that it was not subject to any pending legal action despite its parent being subject to a demand for arbitration, in an attempt to make it more difficult for Plaintiff to recover its losses.

152.    Similarly, just days before, on September 5, 2025, Yasemin Toros replaced Toros as the "person with significant control" in SRT Capital SPC UK Ltd, the UK subsidiary of another

respondent in the ICC arbitration. As of the date of this complaint, Yasemin Toros owns over 75% of that entity.

153. Upon information and belief. Defendants Toros, Başar, Credit Suisse, Credit Suisse Securities, İş Yatırım, and Yasemin Toros acted collectively and concertedly pursuant to an agreement to defraud the Plaintiff. Defendants Başar, Credit Suisse, Credit Suisse Securities, İş Yatırım, and Yasemin Toros are therefore all liable for Defendant Toros' fraudulent acts and the damages stemming therefrom.

### COUNT IV
### Aiding and Abetting Fraud
### (against Başar, Credit Suisse, Credit Suisse Securities, and İş Yatırım)

154. Plaintiff incorporates by reference and realleges each and every allegation contained in paragraph 1 through 153 above as if fully set forth herein.

155. As set forth in Count III, Defendant Toros committed fraud against Plaintiff by: (i) fraudulently inducing Plaintiff to enter the Lending Agreement while concealing his intent to immediately hedge and liquidate the Collateral; (ii) fraudulently inducing Plaintiff to provide additional shares through the September 2022 and April 2023 margin calls while concealing his ongoing theft; and (iii) engaging in a continuous pattern of fraudulent concealment.

156. Defendants Credit Suisse, Credit Suisse Securities, Başar and İş Yatırım, knowingly and substantially assisted Toros in perpetrating this fraud.

157. But for Defendants' Credit Suisse, Credit Suisse Securities, Başar, and İş Yatırım's substantial assistance, Toros could not have perpetrated his fraud. The scheme required: (i) Credit Suisse and Başar's liquidation of the account, (ii) Credit Suisse Securities' execution of the trades; (iii) Credit Suisse's (and Başar's) forged statements and (iv) Is Yatirim's unauthorized transfers.

158. Defendants' Credit Suisse, Credit Suisse Securities, Başar, and İş Yatırım's

knowing participation was a proximate cause of Plaintiff's damages, including the loss of shares valued in excess of $70 million and related consequential damages

159.    Defendants Credit Suisse, Credit Suisse Securities, Başar, and İş Yatırım acted with actual knowledge of the fraud or reckless disregard for whether Toros was defrauding Plaintiff, warranting punitive damages.

### COUNT V
### Conversion and Conspiracy to Commit Conversion
### (against Toros, Credit Suisse, Credit Suisse Securities, Başar, İş Yatırım and Yasemin Toros)

160.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 159 above as if fully set forth herein.

161.    At all relevant times, Plaintiff owned and had the right to possess the Aeva shares deposited as Collateral: 2.4 million shares transferred on July 8, 2022; 460,000 shares transferred on September 23, 2022; and 700,000 shares transferred on May 2, 2023.

162.    The Lending Agreement confirmed Plaintiff's continued ownership, requiring the shares be held in a segregated account.  The E*TRADE confirmation stated this was a custodial—not ownership—transfer.  Section 5(e) expressly prohibited Defendants from selling, trading, pledging, or hedging the Collateral.

163.    Beginning on July 8, 2022, Defendants Toros, Credit Suisse, Başar, Credit Suisse Securities, and İş Yatırım wrongfully exercised dominion over Plaintiff's shares by transferring, selling, and/or pledging them without authorization.

164.    Toros personally orchestrated the conversion, working with Credit Suisse, Credit Suisse Securities, Başar, and İş Yatırım to facilitate unauthorized transfers and admitting in June 2025 that "the shares should not have been pledged."

165.    Defendants' exercise of dominion was intentional and without justification.

166.    On May 19, 2025, Plaintiff demanded return of the shares.  Defendants could not comply because they had already converted them.  On June 3, 2025, Toros admitted "the shares have been liquidated."

167.    As a direct result of Defendants' conversion, Plaintiff has been damaged in an amount exceeding $70 million (the value of 3.56 million shares in June 2025), plus lost voting rights, dividends, and opportunity to benefit from appreciation. Toros, Credit Suisse, and Credit Suisse Securities' willful conversion warrants punitive damages.

168.    Upon information and belief. Defendants Toros, Başar, Credit Suisse, Credit Suisse Securities, İş Yatırım, and Yasemin Toros acted collectively and concertedly pursuant to an agreement to defraud the Plaintiff.  Defendants Başar, Credit Suisse, Credit Suisse Securities, İş Yatırım, and Yasemin Toros are therefore all liable for Defendant Toros' fraudulent acts and the damages stemming therefrom.

## COUNT VI
**Gross Negligence**
**(against Credit Suisse, Credit Suisse Securities, and İş Yatırım)**

169.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 168 above as if fully set forth herein.

170.    As financial institutions holding and managing securities, Credit Suisse, Credit Suisse Securities, and İş Yatırım owed duties to Plaintiff to: (i) verify authorization before transferring or liquidating securities held in Plaintiff's name; (ii) maintain reasonable safeguards against unauthorized transactions; (iii) follow industry standards for custodial accounts; and (iv) investigate red flags indicating potential fraud or unauthorized activity.

171.    Credit Suisse, Credit Suisse Securities, and İş Yatırım's conduct constituted gross negligence—a reckless disregard of their duties and a gross deviation from the standard of care

that reasonable financial institutions would observe.

### A.    Credit Suisse and Credit Suisse Securities' Gross Negligence

172.    Credit Suisse and Credit Suisse Securities demonstrated gross negligence by:

    a.  Executing massive sales of shares from an account bearing Plaintiff's name without verifying authorization or questioning the propriety of these sales;

    b.  Ignoring obvious red flags, including instructions to sell shares from a segregated account in another party's name;

    c.  Providing manipulated account statements that concealed the unauthorized liquidations; and

    d.  Failing to implement any meaningful controls to prevent unauthorized transactions.

173.    Upon information and belief, Credit Suisse Securities, as Credit Suisse's U.S. trading desk, executed these massive sales without any documentation authorizing liquidation of shares held as collateral in Plaintiff's segregated account.

### B.    İş Yatırım's Gross Negligence

174.    İş Yatırım demonstrated gross negligence by:

    a.  Accepting 700,000 shares into a segregated account under Plaintiff's name with knowledge they were collateral subject to specific return conditions;

    b.  Transferring or allowing the transfer of these shares without Plaintiff's authorization;

    c.  Failing to verify authorization before permitting approximately 700,000 shares to leave Plaintiff's account between October 2023 and April 2025;

    d.  Ignoring the obvious impropriety of transferring shares from an account

bearing Plaintiff's name based solely on instructions from third parties; and

    e.   Failing to maintain any reasonable safeguards over securities in its custody.

## C.    Reckless Indifference

175.    Credit Suisse, Credit Suisse Securities, and İş Yatırım's conduct was not mere inadvertence but demonstrated reckless indifference to Plaintiff's rights. Any reasonable financial institution or employee thereof would have recognized the impropriety of liquidating millions of shares from a segregated account without proper authorization.

176.    Credit Suisse, Credit Suisse Securities, and İş Yatırım prioritized their relationships with Toros over their duties to protect customer assets, showing conscious disregard for the consequences of their actions.

177.    As a direct and proximate result of Credit Suisse, Credit Suisse Securities, and İş Yatırım's gross negligence, Plaintiff suffered damages exceeding $70 million, including loss of shares and consequential damages.

178.    Credit Suisse, Credit Suisse Securities, and İş Yatırım's reckless conduct warrants punitive damages to deter financial institutions from abandoning their duties to safeguard customer assets.

## <u>COUNT VII</u>
### Negligence
### (against Credit Suisse, Credit Suisse Securities, and İş Yatırım)

179.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 178 above as if fully set forth herein.

180.    As financial institutions entrusted with custody of securities, Credit Suisse, Credit Suisse Securities, and İş Yatırım owed duties of reasonable care to Plaintiff, including duties to: (i) verify proper authorization before executing transactions; (ii) maintain reasonable procedures

to protect customer assets; (iii) investigate suspicious or unusual trading activity; and (iv) comply with industry standards for handling securities held in custody.

181.    Defendants breached these duties of care through their negligent conduct.

**A.    Credit Suisse and Credit Suisse Securities Negligence**

182.    Credit Suisse and Credit Suisse Securities breached their duties by:

    a.    Failing to verify authorization before liquidating shares held in a segregated account bearing Plaintiff's name;

    b.    Executing sales of millions of shares without obtaining or reviewing documentation establishing the right to sell;

    c.    Processing transactions that a reasonable custodian would recognize as suspicious;

    d.    Failing to maintain adequate procedures to prevent unauthorized transactions; and

    e.    Negligently supervising personnel involved in handling the Collateral Account and executing trades.

183.    A reasonable financial institution exercising ordinary care would have implemented safeguards to prevent the unauthorized liquidation of customer assets and would have investigated before executing such massive sales.

**B.    İş Yatırım's Negligence**

184.    İş Yatırım breached its duties by:

    a.    Failing to verify authorization before transferring shares from an account in Plaintiff's name;

    b.    Negligently allowing approximately 700,000 shares to be transferred

without proper documentation;

    c.  Failing to maintain adequate controls over segregated accounts; and

    d.  Failing to comply with standard banking practices for custodial accounts.

**C.**    **Causation and Foreseeability**

185.    It was reasonably foreseeable that Credit Suisse, Credit Suisse Securities, and İş Yatırım's failure to implement basic safeguards and verify authorization would result in the unauthorized liquidation of customer assets.

186.    But for Credit Suisse, Credit Suisse Securities, and İş Yatırım's negligence, Toros could not have liquidated Plaintiff's shares. Credit Suisse, Credit Suisse Securities, and İş Yatırım's conduct was a proximate cause of Plaintiff's losses.

187.    As a direct result of Credit Suisse, Credit Suisse Securities, and İş Yatırım's negligence, Plaintiff suffered damages including:

    a.  Loss of shares valued in excess of $70 million;

    b.  Deprivation of voting rights;

    c.  Loss of dividends and appreciation; and

    d.  Other consequential damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays that judgment be entered in its favor and prays for:

A.    Compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial, including treble damages;

B.    Punitive damages against all Defendants in an amount to be determined by the Court;

C.    A permanent injunction prohibiting Defendants from further selling, transferring, or disposing of any of Plaintiff's shares or proceeds thereof;

D.      An accounting of all transactions involving Plaintiff's shares, including dates, prices, counterparties, and disposition of proceeds;

E.      Imposition of a constructive trust over any assets traceable to the liquidated shares;

F.      Pre-judgment interest at the maximum legal rate from July 8, 2022;

G.      Post-judgment interest at the statutory rate;

H.      Attorneys' fees and costs of this action;

I.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant FRCP 38, Plaintiff demands a jury trial for all claims and issues in this action that are triable as a matter of right to a jury.

Respectfully submitted,

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

Dated: New York, New York
      September 30, 2025          By:    _/s/ Corey Worcester_
                                         Corey Worcester
                                         Evan Forbes
                                         295 Fifth Avenue
                                         New York, New York 10016
                                         Tel.: (212) 849-7000
                                         coreyworcester@quinnemanuel.com
                                         evanforbes@quinnemanuel.com

                                         _Attorneys for Plaintiff EAD Group LLC_