UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EAD GROUP LLC, Plaintiff, v. BULENT TOROS,,et al. Defendants. | 25 Civ. 8083 (DEH) **OPINION AND ORDER** |

DALE E. HO, United States District Judge:

Plaintiff EAD Group, LLC has sued Bulent Toros ("Toros" or "Mr. Toros"), Egemen Başar, UBS Group AG individually and as successor in interest to Credit Suisse Group AG and Credit Suisse Securities (USA) ("the CS Defendants"),[1] İş Yatirim Menkul Değerler A.Ş ("İş Yatirim"), and Yasemin Toros ("Ms. Toros") (collectively, "Defendants"). EAD Group brings claims under 18 U.S.C. §§ 1962(c) and 1962(d) against Toros, Başar, Credit Suisse Group AG, and Ms. Toros. It brings a claim of fraud and conspiracy to commit fraud against Toros, Başar, the CS Defendants, İş Yatirim, and Ms. Toros. It brings a claim of aiding and abetting fraud against Başar, the CS Defendants, and İş Yatirim. It brings a claim of conversion and conspiracy to commit conversion against Toros, the CS Defendants, Başar, İş Yatirim, and Ms. Toros. And it brings claims of negligence and gross negligence against the CS Defendants and İş Yatirim.

Defendant Toros has moved to compel arbitration of the claims against him. ECF No. 59. Defendants Toros, Başar, the CS Defendants, and Ms. Toros have also moved to dismiss the claims against them. ECF Nos. 33, 61, 62, 90.

[1] The Court refers to Defendants Credit Suisse Group AG and Credit Suisse Securities (USA) collectively as the "CS Defendants."

For the following reasons, Bulent Toros's motion to compel arbitration is **GRANTED**. The case is **STAYED** pending resolution of the arbitration.

## BACKGROUND

Plaintiff EAD Group LLC ("EAD" or "Plaintiff") is a company beneficially owned by Mina Rezk. Compl. ¶ 16, ECF No. 1. On June 16, 2022, EAD Group entered into a Lending Agreement with W Management Services ("WMS") and SRT Capital SPC Ltd. ("SRT"): two entities managed by Bulent Toros. Compl. ¶ 31. The agreement provided that in exchange for receiving a loan from WMS, EAD would pledge equity shares of Aeva Technologies, Inc. as collateral. *Id.* Eric Maass, an employee at one of Toros's companies, served as the point of contact between Rezk and Toros during the negotiation of the Lending Agreement. *Id.* ¶ 36.

Rezk initially agreed to provide $40 million in Aeva shares as collateral, and negotiated protections in the Lending Agreement against "loan[ing], pledg[ing], or repledge[ing]" the shares or "engag[ing] in any hedging activities with respect to the" collateral. *Id.* ¶ 33. The agreement also provided that the shares be booked to a segregated portfolio account (the "collateral account"). *Id.* ¶ 35. Plaintiff alleges that prior to the execution of the lending agreement, Toros sent an email to Maass with the heading "Aeva initial thoughts," including hedging materials and writing "This tells us to hedge day 1." *Id.* ¶ 37. Plaintiff alleges that had it known that Toros planned to sell the collateral shares, it would not have executed the Lending Agreement. *Id.* ¶ 39.

On July 8, 2022, EAD transferred 2.4 million Aeva shares, then worth about $40 million, to the collateral account with Credit Suisse. *Id.* ¶ 45-46. Maass represented to Rezk that the shares in the collateral account remained under EAD's control, specifically that WMS had created a segregated portfolio company under EAD's control to be the accountholder. *Id.* ¶ 43. However, the Complaint alleges this was false. *Id.* ¶¶ 43-44. Instead, Toros collaborated with Egemen Başar, an associate and private banker at Credit Suisse, to form the collateral account prior to the

formation of the segregated portfolio company, SPC EAD Group LLC, and did not ultimately give the portfolio company control over the account. *Id.* ¶¶ 44, 46. Toros and Başar—who Credit Suisse represented to Rezk as a point of contact for the collateral account—worked together to maintain and conceal Toros's unauthorized control over the account. *Id.* ¶ 46.

On July 11, 2022, Maass provided Rezk with a document appearing to be a Credit Suisse account statement confirming the transfer of 2.4 million Aeva shares into the collateral account held by SPC EAD Group LLC. *Id.* ¶ 54. However, there were several differences between that document and a prior statement made on June 28, 2022, including missing pages and formatting inconsistencies that the Complaint alleges suggest that Toros and Credit Suisse manipulated the document. *Id.*

Using his control over the account, Toros, with the assistance of Credit Suisse, began selling Aeva shares from the collateral account immediately after the transfer. *Id.* ¶ 47. The Complaint alleges that Defendants liquidated about 1.84 million of Rezk's shares in fewer than three months. *Id.* ¶ 48. The corresponding spike in sales effectively caused Aeva's share price to decrease significantly. *Id.* ¶ 53.

The Lending Agreement between EAD Group and WMS permitted WMS to call for additional shares if Aeva's share price fell below 60% of its initial price. *Id.* ¶ 55. The share price met this threshold by September 22, 2022, and Toros instructed Maass to email Rezk issuing a call for additional shares. *Id.* Rezk transferred 460,000 additional shares to the collateral account on September 23, 2022. *Id.* ¶ 56. The Complaint alleges that Toros continued to sell Aeva shares from the collateral account following this transfer. *Id.* ¶ 57.

Around October 4, 2022, Rezk received another document appearing to be an updated Credit Suisse account statement for the collateral account. *Id.* ¶ 62. The statement showed a total of 2,860,000 shares in the account, consistent with the initial amount and the added shares Rezk

had transferred to fulfill his obligations under the collateral call. *Id.* The document contained similar inconsistencies to the July 11 statement which the Complaint alleges suggests that Toros and Credit Suisse manipulated the document. *Id.* ¶ 63.

Toros continued selling Aeva shares from the collateral account between September 24, 2022 and April 2023. *Id.* ¶ 65. On April 5, 2023, Toros notified Rezk that the decline in Aeva share price left WMS with no option but to sell the collateral shares. *Id.* ¶ 66. However, the Complaint alleges this was a misrepresentation because it implied the collateral shares remained in the account, while Toros had already sold most or all of them. *Id.*

Unaware of the misrepresentation, Rezk entered a new agreement on May 1, 2023 to provide an additional 700,000 shares as collateral to support the loan. *Id.* ¶ 67. As part of that agreement, WMS was required to return those additional shares to Rezk if the value of Aeva shares equaled or exceeded $2.00 per share for ten business days. *Id.*

By that point, Başar no longer worked at Credit Suisse. *Id.* ¶ 69. Plaintiff alleges on information and belief that this deprived Toros of his ability to internally access and misappropriate shares held in the existing collateral account. *Id.* Consequently, upon entering the May 2023 agreement to provide additional shares, Maass initially proposed that Rezk send the shares to WMS's account at a different bank. *Id.* ¶ 70. Rezk insisted that the transferred shares remain segregated under an account with EAD as the accountholder. *Id.* Toros then proposed the shares be transferred to a new collateral account at Defendant İş Yatirim with Citibank as custodian. *Id.* Rezk agreed and transferred the shares. *Id.* The Complaint alleges that at the time, Toros concealed the involvement of İş Yatirim, instead representing that the funds would be sent to a collateral account at Citibank. *Id.* ¶ 71.

In December 2024, Maass provided Rezk with another document appearing to be a Credit Suisse account statement showing that the collateral account held 3.56 million shares. *Id.* ¶ 72.

However, Rezk later learned that the Credit Suisse account had been closed since April 2023, meaning the purported document was falsified. *Id.* The Complaint alleges the document has the same irregularities in formatting and pagination as the statements provided from July and October 2022. *Id.*

After the shares were transferred to İş Yatirim, Toros began to sell those as well. *Id.* ¶ 73. The Complaint alleges that İş Yatirim knew the funds were to be held in a segregated account, but did nothing to interfere with Toros's efforts to sell them. *Id.* The additional Aeva shares were fully liquidated by November 24, 2023. *Id.* ¶ 74.

The price of Aeva shares increased in early 2025, and in May 16, 2025 reached the threshold to fulfill WMD's obligation to return the additional 700,000 Aeva shares pledged in May 2023. *Id.* ¶ 82. Rezk contacted Maass to demand the return of the shares, but was unsuccessful. *Id.* ¶ 83. The Complaint alleges on information and belief that on or around May 31, 2025, Toros left the United States and now resides in Turkey. *Id.* ¶ 84. On June 3, 2025, Toros sent Rezk a letter stating that he had directed the custodian to deliver the shares, but that the custodian informed him that the shares has been liquidated "as a result of an unmet margin obligation on the part of" WMS. *Id.* ¶ 85. Toros claimed in a subsequent phone call with Rezk that the shares had been liquidated in early 2025. *Id.* ¶ 86.

On June 23, 2025, EAD filed a demand for arbitration against WMS before the International Chamber of Commerce. *Id.* ¶ 91. EAD amended its arbitration demand on September 11, 2025 to detail allegations of Toros's fraudulent activity and intent. *Id.* On September 13, 2025, Ms. Toros filed for dissolution of one of WMS's wholly-owned subsidiaries in the United Kingdom, of which she was the sole director. *Id.*

## LEGAL STANDARDS[2]

The Federal Arbitration Act ("FAA") establishes procedures for enforcing arbitration agreements in federal court. 9 U.S.C. § 1 *et seq*. The FAA reflects an "emphatic federal policy in favor of arbitral dispute resolution." *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam) (internal quotation marks and citations omitted). The Court's inquiry when confronted with an agreement to arbitrate is narrow. Unless otherwise provided for in the agreement, courts consider only the threshold questions of arbitrability. *Dr.'s Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250-51 (2d Cir. 2019). Arbitrability is determined by a two-part test: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). In applying this test, courts must "construe arbitration clauses as broadly as possible." *Id.*; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

On a motion to compel arbitration, a court adopts "a standard similar to that applicable for a motion for summary judgment" that requires courts to "consider[] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017); *see also Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833-34 (2d Cir. 2021). The court must "draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). "Where

---

[2] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

parties are bound to an arbitration agreement, courts are instructed to favor arbitration as a form of dispute resolution." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022).

## DISCUSSION

### I. Motion to Compel Arbitration

Defendant Bulent Toros has moved to compel arbitration of Plaintiff's claims against him. Mem. of Law in Supp. of Bulent Toros' Mot. to Compel Arbitration ("Toros Arb. Mem."), ECF No. 60.

#### A. Whether Toros May Invoke the Arbitration Clause

The agreement governing the initial loan and transfer of Aeva shares binds WMS as the lender, SRT as the agent, and EAD Group as the borrower. Margin Lending Agreement, ("Lending Agreement"), ECF No. 1-1. The agreement contains an arbitration clause providing that:

> "All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by a single arbitrator appointed in accordance with the said Rules. The law of this arbitration clause shall be New York Law. The seat of arbitration shall be New York, New York. [] . . . ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM, ACTION, OR LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO, IS HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT." *Id.* at 15.

Toros argues that because all of EAD Group's claims against him arise from his alleged conduct related to the loan collateral transferred pursuant to the Lending Agreement, they fall within the scope of the arbitration clause. Toros Arb. Mem. at 9-12. The parties do not dispute the validity of the agreement or its arbitration clause.

Plaintiff contends that Toros is not a party to the Lending Agreement and therefore cannot compel the arbitration of claims brought against him in connection with the agreement. Pl.'s Mem. of Law in Opp'n to Def. Bulent Toros' Mot. to Compel Arbitration ("Pl.'s Arb. Mem."), ECF No.

75 at 8-9. And it argues that Toros cannot invoke equitable estoppel to compel arbitration as a non-signatory to the agreement because it was not reasonably foreseeable that EAD would have to arbitrate with him and because the doctrine of unclean hands precludes the relief he seeks. *Id.* at 10-16.

Toros responds that he may invoke the arbitration clause as the principal of WMS, including through equitable estoppel. Reply Mem. of Law in Supp. of Bulent Toros' Mot. to Compel Arbitration ("Arb. Reply Mem."), ECF No. 92 at 1-4. And he argues that the doctrine of unclean hands does not apply to preclude him from enforcing the arbitration provision. *Id.* at 5-8.

Toros is not a signatory to the Lending Agreement. However, a non-signatory to a contract can benefit from an arbitration provision "so long as there is a sufficient relationship between the signatory . . . and the non-signatory seeking to compel arbitration." *Ross v. Finzer*, No. 25 Civ. 1179, 2025 WL 2860070, at *5 (S.D.N.Y. Oct. 8, 2025); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) ("under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed . . . and the issues that had arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." (internal quotation marks omitted)). Generally, a corporate executive, employee, or board officer is treated as an agent of the company. *See Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 460 (2021) (a corporate agent is someone "authorized to act on behalf of a corporation," including "all employees and officers who have the power to bind the corporation."). "Federal courts have consistently afforded agents the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the

corporation." *Hirschfeld Prods. v. Mirvish*, 88 N.Y.2d 1054, 1056 (1996). Under these principles, Toros may invoke the arbitration provision.

In opposition to Toros's motion to compel arbitration, Plaintiff notes that in the arbitration proceedings against WMS and SRT, Toros has attempted to distance himself from the negotiation of the Lending Agreement, claiming that Maass negotiated the contract's terms without the knowledge of WMS or SRT. Pl.'s Arb. Mem. at 10-13. Plaintiff argues that through these statements, Toros has "disclaimed" the relationship with WMS and SRT necessary to invoke the arbitration clause. *Id.* at 13. However, in the Complaint, Plaintiff acknowledges that Toros is "an authorized signatory of the Lending Agreement." Compl. ¶ 24. It notes that Toros "principally manages both WMS and SRT." *Id.* ¶ 31. And Plaintiff's claims against Toros are premised on his acknowledged abilities: (1) to direct the sale of collateral shares transferred pursuant to the Lending Agreement, *id.* ¶¶ 92-116, 160-68, and (2) to invoke Plaintiff's obligations under the Lending Agreement to induce Plaintiff to pledge additional shares. *Id.* ¶¶ 117-53. In light of these allegations, Plaintiff's argument that arbitration with Toros was not reasonably foreseeable is misplaced.

Plaintiff also argues that Toros may not invoke the arbitration clause because of the doctrine of unclean hands. Pl.'s Arb. Mem. at 13-16. While Toros is alleged to have engaged in fraudulent conduct, the conduct as alleged here does not prevent him from invoking the arbitration clause. "Because the Court's subject matter jurisdiction in reviewing a [motion to compel arbitration] is limited to challenges that go to the making of the agreement to arbitrate, it stands to reason that that misconduct allegedly giving rise to the unclean hands must also relate directly to the making of that agreement." *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 481 (S.D.N.Y. 2013) (internal quotation marks and citations omitted). Plaintiff's allegations of unclean hands are not premised on Toros's conduct around the making of the agreement to arbitrate. Pl.'s Arb. Mem.

at 14. Instead, Plaintiff adduces evidence that, beginning in 2023, Toros has "systematically abandoned or dissolved any entity with a connection to the [Lending Agreement]." *Id.* Plaintiff argues that these actions "strike[] at the heart of [the] agreement to arbitrate" because they represent Toros's efforts to render arbitration futile and avoid his obligations to make Plaintiff whole. *Id.* at 14-15. But even assuming this argument has merit, it does not bear on the *making* of the arbitration agreement, and therefore cannot provide a basis to deny the motion to compel arbitration. *See In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 481.

**B. Whether Plaintiff's Claims are Arbitrable**

The Lending Agreement's arbitration clause designates for arbitration "[a]ll disputes arising out of or in connection with the present contract." Lending Agreement at 14. This is a broad arbitration clause, and accordingly, "there is a presumption that [claims arising from the agreement] are arbitrable." *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16 at 20 (2d Cir. 1995). Plaintiff's RICO claims may be subject to arbitration. *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 242 (1987). Likewise, Plaintiff's state law claims for fraud and conversion against Toros arise from allegations of his conduct related to his obligations under the Lending Agreement, and may also be subject to arbitration. *See Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 440 (S.D.N.Y. 2019) (state law claims including common law unjust enrichment and fraud claims subject to broad arbitration provision).

Plaintiff does not contest the arbitrability of its claims against Toros. *See* Pl.'s Arb. Mem. at 17-18. A number of Plaintiff's claims, however, are not brought against Toros; for example, its aiding and abetting fraud claim and its negligence and gross negligence claims are brought against the CS Defendants and İş Yatirim, Compl. ¶¶ 154-59, 169-87; and its aiding and abetting fraud claims are brought against Başar, the CS Defendants, and İş Yatirim—none of whom are parties

to the Lending Agreement. *Id.* at 17. Plaintiff argues these claims are "not implicated by the arbitration." *Id.*

But Toros seeks to compel arbitration only of the claims against him. Plaintiff's argument that its claims against other Defendants are not arbitrable does not undermine the arbitrability of claims at issue on Toros's motion to compel arbitration. Accordingly, having determined that Toros may properly invoke the Lending Agreement's arbitration clause and that the claims against him are arbitrable, the Court **GRANTS** the motion to compel arbitration of the claims against Toros.

### C. Whether a Stay is Appropriate

Toros has also requested that the Court dismiss or stay any claims that are not subject to arbitration. Toros Arb. Mem. at 12-14. In deciding whether to stay or dismiss a case following a district court's order to compel arbitration, the Supreme Court has stated that "staying rather than dismissing a suit comports with the supervisory role that the FAA envisions for the courts . . . Keeping the suit on the court's docket makes good sense in light of this potential ongoing role, and it avoids costs and complications that might arise if a party were required to bring a new suit." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). The Court therefore considers whether a stay of the case is appropriate before considering whether dismissal is warranted.

On the question of whether to issue a stay pending arbitration, Section 3 of the FAA provides that "[if] any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . the court in which such suit is pending . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. In deciding whether to stay litigation concerning non-arbitrable claims pending the resolution of arbitration on arbitrable claims, "[t]he Court must consider factors such as the desirability of avoiding piecemeal litigation and the degree to which

the cases necessitate duplication of discovery or issue resolution." *Maritima de Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*, No. 10 Civ. 8134, 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011). Discretionary stays are appropriate where there is a substantial amount of factual overlap between arbitrable claims and claims that cannot be arbitrated. *Winter Invs., LLC v. Panzer*, No. 14 Civ. 6852, 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015).

As noted, Plaintiff's aiding and abetting fraud claim and its negligence and gross negligence claims are brought against non-signatories to the Lending Agreement and are not properly subject to arbitration. However, there is substantial factual overlap between those claims and the claims against Toros that are subject to arbitration, insofar as both sets of claims arise from the alleged misappropriation of shares and fraud in connection with obligations under the Lending Agreement. Given that overlap, the Court concludes that it would be appropriate to stay this litigation in its entirety pending resolution of arbitration, in order to avoid piecemeal and/or duplicative proceedings.

## CONCLUSION

For the foregoing reasons, Toros's motion to compel arbitration is **GRANTED**, and the case is **STAYED** pending arbitration. The parties are directed to file a joint status letter: (1) within seven days of the conclusion of arbitration proceedings, or (2) within six months of the date of this Order and every six months thereafter regarding the status of arbitration proceedings, whichever is sooner.

The Clerk of Court is respectfully requested to terminate ECF No. 59 and to stay this case.

SO ORDERED.

Dated: September 17, 2026

New York, New York

DALE E. HO
United States District Judge